## Walker, et al. v. Irvine's Executor.

(Decided June 22, 1928.)

### Appeal from Madison Circuit Court.

1. Wills.—The fundamental rule for the construction of a will is to ascertain the intention of the testator.

2. Wills.—In arriving at testator's intention, court should look to the will as a whole and to the language employed by the testator.

3. Wills.—Testator's intent, if ascertainable, controls regardless of collateral and subsidiary rules which may be employed in arriving at the intention when it is obscured.

4. Wills.—Devise of property to testator's daughter, "on trusts and conditions hereinafter stated," followed by a provision that the devisee should hold the property for her sole and separate use and benefit for and during her natural life, together with the control thereof during that time as if she were feme sole, and power of sale for purpose of reinvestment, held to evidence, not a fee, but a life estate in the property, free from the control of any husband she might have.

5. Wills.—A devise to one for life, with remainder to his heirs or to his bodily heirs, creates, under Ky. Stats., sec. 2345, abolishing

the rule in Shelly's case, a contingent remainder, since the heirs of the devisee cannot be known until his death.

6.  Wills.—A devise to one for life, with remainder on his death to his then living children, creates only a contingent remainder in their favor.

7.  Reversions.—A true possibility of reverter is an estate after an estate terminable by special or collateral limitations, such as an estate to A until B returns from Rome.

8.  Reversions.—A true possibility of reverter is not alienable.

9.  Wills.—Will devising property to testator's daughter for life with power of sale and providing that on death of daughter property should be divided among her then living children including descendants of such as may have died created a contingent remainder in the daughter's children, not an estate terminable by special or collateral limitation, and hence the estate after the life estate and until the contingency happened was a reversion and not a possibility of reverter.

10. Wills.—Agreement between devisees under will that certain devisee's daughter of testator held severally and that each of them, should they survive all their children and the descendants of such as were dead, owned the fee to property devised to their branch of the family, held valid and binding on the parties to it and those claiming under them.

11. Estoppel.—Parties to agreement between devisees as to estates held by certain devisees held estopped to repudiate the agreement after being acted upon by other parties thereto.

ALLEN, BOTTS & DUNCAN for appellants.

GRANT E. LILLY, BURNAM & GREENLEAF and BECKHAM, HAMILTON & BECKHAM for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

David Irvine died testate in 1872, leaving four children, Sarah I. White, Elizabeth S. Irvine, I. Shelby Irvine, and David W. Irvine. At the time of his death he was the owner of a considerable estate in Kentucky, Missouri, and elsewhere. The first three clauses of his will, so much of the fourth clause as is pertinent to the present controversy, and the residuary clause read:

"First clause: I give and bequeath unto my daughter, Sarah I. White *upon the trusts and conditions hereinafter stated* the following property, to wit: My present residence with the lands and lots thereto attached deeded to me by W. R. Letcher and E. H. Fields containing some nine or ten acres. I

also give to my said daughter Sarah a tract of land lying and being in the county of Madison on Jacks creek, adjoining the lands of C. M. Clay and deeded to me by Cole and White, containing about one hundred and fifty acres.

"I also devise to my said daughter Sarah twenty shares of bank stock owned by me in the Northern Bank of Kentucky and direct my executors hereinafter appointed to have the certificate of stock transferred in the name of the said Sarah I. White.

"I also will and bequeath to my said daughter, Sarah I. White, my equal half of all the property owned jointly and equally by Christopher J. Field and myself in the county of Bolivar, in the state of Mississippi, consisting of lands, stock, farming utensils, including all the joint property we own as partners in cotton planting, the deeds and patents to us of record will show the quantity of land owned by us jointly.

"I also will and devise to my said daughter, Sarah, sixty-four acres of the tract of land conveyed to me by John Newland, said sixty-four acres of land to be laid off on the north side of said tract on the Richmond and Lexington turnpike road and along the line of Joseph Jones, so as to suit the land hereafter herein willed to my son, I. Shelby Irvine.

"Second clause: I will and bequeath to my daughter, Elizabeth S. Irvine *upon the trusts and conditions hereafter stated* the following property, to wit: A tract of land adjoining William Green in Madison county, Kentucky, known as the Clarke place conveyed to me by deeds from John Sanders and John A. Williams containing about ninety-seven acres.

"I also devise to my said daughter Elizabeth a small tract of land in Madison county, adjoining the lands of R. White, Quinn, and Caldwell known as Cane Ridge and deeded to me by John A. Williams containing about twenty-five acres.

"I also give and bequeath to my said daughter, Elizabeth my interest of one-fourth in a corner store house and lot in the town of Richmond, the balance being owned and occupied by Yates and Stewart as a drug store, and deeded to me by J. W. Steele of record in the Madison county clerk's office.

"Clause three: I will and bequeath to my son, Isaac Shelby Irvine, three hundred and five acres of land lying and being in Madison county, Ky., on the Richmond and Lexington turnpike road, lying south and adjoining the sixty-four acres herein willed to my daughter, Sarah I. White, and being all the land conveyed to me by John Newland except said sixty-four acres, and forty-five acres hereinafter willed to my son David W. Irvine, and more fully described in that bequest to him. I make it as an earnest request of my said son, I. Shelby Irvine, that if he should die without having issue that he give said three hundred and five acres of land or its value to my daughter, Sarah I. White, if living, if not then to her children, if any of her children should be dead having issue, in that event said issue is to receive an equal share. I will and bequeath to my said son, I. Shelby Irvine, all my half of the stock, farming utensils, crops, including all joint property we own, also any money on hand belonging to us jointly.

"I will and bequeath to my said son, I. Shelby Irvine, three shares of my stock in the Richmond and Lexington Turnpike Road Company. I also will and bequeath to my said son, I. Shelby Irvine, my clock and case.

"Clause four: I will and bequeath to my son, David W. Irvine, my tract of land lying and being in Madison county, Ky., on the Richmond and Lexington turnpike road known as the Dudley Place and deeded to me by Walter and Wm. Chenault, and containing about one hundred and eighty acres more or less. I also will and bequeath to my son, D. W. Irvine, forty-five acres of the Newland land, reserved out of that tract and not willed in clause third, to I. Shelby Irvine. Said forty-five acres shall be laid off on the Richmond and Lexington road, along the north line of the Dudley tract, above mentioned, to the Shallow Ford road, in such manner as to suit the land herein given to my son, I. Shelby Irvine.

"I also will and bequeath to my said son, David W. Irvine, two hundred and forty acres of land I own in Gentry county, Missouri, deeded to me by E. V. Arnold, said land is the north one-half of N. W. Qr. and N. W. Qr. of N. E. Qr. 120 acres, and the

south one half of N. W. Qr. and S. W. Qr. of N. E. Qr. 120 acres, all in section 34, town 61, range 32, and containing in all 240 acres.

"I also will and bequeath to my son, David W. Irvine, three shares of the stock I own in the Richmond and Lexington Turnpike Company and also the stock I own in the Richmond and Lancaster Turnpike Company, and stock I own in the Richmond and Big Hill Turnpike Company.

"I also will and bequeath to my son, David W. Irvine, my jennets and my brood mare, Mollie Long.

"I own in the city of Kansas, Jackson county, in the state of Missouri, sixty-seven town lots and one-fourth of an undivided lot lying and being in what is known as Ashlands addition to said city, as will appear by the recorded plat of said city, and deed made to me by Samuel H. Woodson, John M. Ashburn and Henry Coates and others.

"I have also about forty-three hundred acres of land lying and being in the county of Bates, Henry, Cap, Caldwell, Dekalb, in the said state of Missouri, for more particular description of said town lots and lands reference is hereby made to a list I have made out of the number and block in which said lots are situated, and the numbers, sections, townships, and ranges and counties in which said lands are situated, which list is marked A, and hereby referred to and made a part of this my last will and testament.

"Such of these town or city lots, and lands as above described as may be unsold or not disposed of by me at my death, I hereby will and bequeath to all my children, to wit: Sarah I. White, Isaac Shelby Irvine, Elizabeth S. Irvine and David W. Irvine, share and share alike.

"It is my will and desire and I hereby authorize and empower my executors hereinafter appointed, to lease, sell or have a division amongst my children of said town lots and lands or any part thereof when they, and my two daughters shall think it to their interest to do so, and if any leases or sales are made the proceeds are to be equally divided amongst all my children.

"As the said taxes on said lots and lands are very high, said executors are hereby authorized to sell any part of said lots and lands at any time to pay taxes or other expenses incident thereto.

"I hereby authorize and give to my said executors, hereafter appointed full and ample power to make deeds of conveyance or leases for any part of said lots and lands, that they may sell or lease and also in other cases where it is necessary and proper for me to make deeds of conveyance on my own account, and as surviving executor of my father, William Irvine, deceased.

"I give and bequeath all the foregoing property herein willed to my daughter Sarah I. White and Elizabeth S. Irvine, for their sole and separate use and benefit, for and during their natural life, and desire that they have control thereof, during that time as if they were feme soles, and receive and enjoy and dispose of in their discretion all the rents and profits.

"At their death it is my will that all of said property to be equally divided amongst their *then* living children, including the descendants of any of such as may have died, said descendants of any one who may be dead to receive a child's part. I vest my said daughters with full power and authority to sell and convey in their discretion, that they invest the proceeds of such sale or sales in other property or stocks and hold the same upon like uses and trusts as the property herein bequeathed to them are subject to.

. . . . . . . .

"It is my will and desire that if I have in this, my will, left any of my property real or personal undisposed that the same be equally divided amongst all my children, I make it as a request of all my children that if any of them should die, without issue, that in so far as they may have received any estate from me, that at their death they will the same to my surviving children or to the issue of those that may be dead.

"I think this is but a reasonable request and I have confidence that it will be complied with by all my children." (Italics ours.)

Of the sons mentioned in this will David W. Irvine never married, and I. Shelby Irvine left no children. They both died prior to the death of their sister Elizabeth S. Irvine. She had married, during the life of her father, a kinsman, Wm. M. Irvine, who died in 1891. She had at the time of her father's death children living. All these

children died during their minority, prior to the death of their mother, and having never married. Sarah I. White also died before her sister Elizabeth S. Irvine. Mrs. White left surviving her five children, of whom Shelby W. Walker, David I. White, and Susan McDowell White were living at the time of Elizabeth S. Irvine's death. Miss Susan M. White has since died testate. Shelby W. Walker and David I. White are her residuary devisees. The other two children of Mrs. Sarah I. White died during the lifetime of Elizabeth S. Irvine. They left descendants, including William Irvine Greenway.

Soon after the will of David Irvine was probated in 1872, a controversy arose between the devisees mentioned in its first four clauses as to what estate Sarah I. White and Elizabeth S. Irvine took under these clauses. These devisees, being all of the devisees under the will concerned in the matter together with the consorts of such as were married, entered into a written agreement, which they signed and acknowledged and had recorded in the Madison county clerk's office on August 22, 1872, and by which they agreed, in substance, that the devises to Sarah I. White's branch of the family and those to the Elizabeth S. Irvine branch of the family were in severalty and not joint to the two branches, and that each of these ladies, should they survive all their children and the descendants of such as were dead, owned the fee in the part devised to that branch of the family.

In 1877, Elizabeth S. Irvine conveyed in fee to her brother, David W. Irvine, the property which had been devised to her by the will of her father. David W. Irvine, in turn, conveyed in fee this property to Wm. M. Irvine, the husband of Elizabeth S. Irvine. When Wm. M. Irvine died in 1891, he devised all of his estate to his wife, Elizabeth S. Irvine, as his sole heir, but provided that, if she died intestate and without making any disposition of his estate, it should be divided as he then set out in his will. Before closing that will, he provided that all of the dispositions he had made were subject to the approval, alteration, or change in whole or in part by his wife, except the legacy to John S. Harris. This particular legacy is not involved in this lawsuit.

Among the dispositions over after the death of his wife, Elizabeth S. Irvine, Wm. Irvine devised a Madison county farm, which was part of the devise to Elizabeth S. Irvine under the will of her father, and which she had

conveyed 'to her brother and he to Wm. Irvine as herein-before stated, to David Irvine White, a son of David I. White, who was the son of Sarah I. White. This devise was on condition that this David Irvine White should drop the name of White and take that of his ancestor, David Irvine. David Irvine White did later drop the name of White, and is known in this litigation as David Irvine.

Mrs. Elizabeth S. Irvine died in November, 1920, leaving a very elaborate will. Her executor, in due course of time, instituted this suit to settle her estate and to construe her will and those of her father and husband. One branch of this suit reached this court in the case of Greenway v. White, 196 Ky. 745, 246 S. W.. 137, 32 A. L. R. 1385. In that branch of this litigation, David Irvine, who had dropped his surmane of White, insisted that under the will of Wm. Irvine he was vested with title to the Madison county farm to which reference has here-tofore been made. On the other hand, William Irvine Greenway insisted that, as the residuary legatee of Eliza-beth S. Irvine, he was vested with that title either be-cause she was vested with a fee-simple estate. in that property by the will of her husband, his disposition over being invalid, or 'because under the will of her husband, she had the power to appoint, different from the disposi-tions made by her husband, and she had exercised this power of appointment in his favor. The claim of Green-way was upheld. After this case had 'been decided by this court, a suit was instituted to contest the will of Eliz-abeth S. Irvine. That suit resulted in her will being sus tained. Irvine v. Greenway, 220 Ky. 388, 295 S. W. 445. The present branch of the suit to settle the estate of Mrs. Elizabeth S. Irvine and to construe her will and that of her father involves, first, the question of what estate Mrs. Elizabeth S. Irvine took under her father's will.

It is settled that the fundamental rule for the con-struction of a will is to ascertain the intention of the tes-tator, and, in arriving at that intention, the courts should look to the will as a whole and to the language the tes-tator employed in it. If in so doing his intention can be ascertained, that intention controls, regardless of collat-eral and subsidiary rules which may be employed in ar-riving at the intention when it is obscure. Jones v. Jones' Ex'rs, 198 Ky. 756, 250 S. W. 92; State Bank of Eau Gallie v. Rose's Adm'r, 219 Ky. 562, 293 S. W. 1087.

Reading the will of David Irvine in the light of this principle, we are convinced that he intended, by the language he used, to vest in his daughter Elizabeth S. Irvine a life estate in the property here in question, free from the control of any husband she might have, and with a power of sale for purposes of reinvestment. True it is that, in the second clause of his will, David Irvine, in making the devise to Elizabeth S. Irvine, used the expression, "upon the trusts and conditions hereinafter stated." But, when the testator in the fourth clause of the will came to define the exact nature of the estate he intended his daughters, Mrs. White and Mrs. Elizabeth Irvine, should take, he expressly stated that the property devised to them by his will was for their sole and separate use and benefit for and during their natural lives, respectively, and that they should enjoy its rents and profits as though they were femes sole. He then directed what should be done with the property on their death. This language in the will is incompatible with the idea that he intended to devise to them a fee. The testator could not have employed clearer language than he did in this fourth clause to express an intention to vest a life estate only in Mrs. Elizabeth Irvine. It is manifest that in the earlier portion of the will he was not undertaking to sharply state the nature of the estate he was devising to his daughter for the expression used, "upon the trusts and conditions hereinafter stated," indicate that the reader must look elsewhere in the will for that information. When he does, he finds no trust, but a provision, which, were it not for the expression referring to "trusts and conditions" used in the earlier part of the will, no one would have the hardihood to contend created in these daughters aught but a life estate, at least under section 2345 of our Statutes, which provides:

"If any estate shall be given by deed or will to any person for his life, and after his death to his heirs, or the heirs of his body, or his issue or descendants, the same shall be construed to be an estate for life only in such person, and a remainder in fee simple in his heirs, or the heirs of his body, or his issue or descendants."

It must not be forgotten that, at the time David Irvine wrote his will, the husband then had in this state his common-law rights in the realty of his wife which had

not been set apart to her separate use. David Irvine was trying by his will to create a separate estate in his daughters, free from the control of their husbands. This he did, and no doubt this accounts for the expression he used of "trusts and conditions." But, when read as a whole the will does no more than create in Mrs. Elizabeth Irvine a life estate free from the control of her husband, coupled with a power of sale. Cf. Lossie v. Central Trust Co., 219 Ky. 1, 292 S. W. 338; Huff v. Hamilton, 211 Ky. 265, 277 S. W. 274: Ewering v. Ewering, 199 Ky. 450, 251 S. W. 645.

The next question is, where did the estate in which Mrs. Elizabeth Irvine had a life interest go after her death? The will of David Irvine provided that this property on the death of Mrs. Irvine was to be equally divided amongst her *then* living children, and the descendants of such children who may have died per stirpes. A devise to X for life, remainder to his heirs, creates, under section 2345 of our Statutes, which abolishes in this state the rule in Shelly's case, a contingent remainder, since the heirs of X cannot be known until his death. See Campbell v. Hinton, 150 Ky. 546, 150 S. W. 676. The same is true of a devise to X for life, remainder to his bodily heirs, unless the term "bodily heirs" be construed to mean children. See Kendrick v. Scott, 200 Ky. 202, 254 S. W. 422. Pursuant to the same principle underlying these two states of case, it is also settled that a devise to X for life, remainder, on his death, to his then living children, creates only a contingent remainder in their favor. Thus in Froman v. Froman, 175 Ky. 536, 194 S. W. 809, the devise was construed to mean one to Mrs. Rhoda D. Froman for life, remainder on her death to her children then living, if none, then over. It was held that the remainder to the children living at the death of Mrs. Rhoda S. Froman was a contingent remainder. A number of authorities are cited to sustain this result. In Sledd v. Rickman, 192 Ky. 823, 234 S. W. 619, the devise was to W for life, remainder to N if she be living at the termination of the life estate. It was held that N took a contingent remainder, and, having died during the life of W, the estate went as undevised estate of the testator. In Nunnelly's Guardian v. Nunnelly, 180 Ky. 131, 201 S. W. 976, the devise was to Nannie Nunnelly for life, and, at her death, it was to go in fee to her children if she left any surviving her at that time, and, if

not, the land was to pass in fee to such children of Mattie Weathers as should then be surviving. The court said:

"It is equally clear that the interests of the children of Nannie Nunnelly, under the provisions of both the will of James A. Darnaby and that of Martha Weathers, is neither a vested remainder nor a defeasible fee, as no interest vested in them under either will, except in the event they should be surviving at the time of the death of Nannie Nunnelly. The interest acquired by them under these wills was that of a contingent remainder. As to whether the children of Nannie Nunnelly will ever have any interest in the lands is contingent upon their being alive at the death of their mother. As to whether they will or will not survive their mother is dubious and uncertain, and the further uncertainty exists as to whether one or more or either of them may survive their mother. The time is fixed in the will at which the remainder interest may vest in them, and when they shall become capable of entering into possession at the death of Nannie Nunnelly. Froman v. Froman, 175 Ky. 536, 194 S. W. 809; Jailette v. Bell, 110 S. W. 298, 33 Ky. Law Rep. 159; Whallen v. Kellner, 104 S. W. 1018, 31 Ky. Law Rep. 1285; Augustus v. Seabolt, 3 Metc. 156; Williamson v. Maynard, 162 Ky. 726, 173 S. W. 122; Williamson v. Williamson, 18 B. Mon. 368."

See, also, Goff v. Renick, 156 Ky. 588, 161 S. W. 983.

In the David Irvine will, he provided that the property devised to Mrs. Elizabeth Irvine was on her death to be divided among her *then* living children and the descendants of such children as had in the meantime died. As it could not be determined who should take this remainder until the life tenant died, it is clear, under the authorities cited, that the remainder thus created was a contingent one. As Elizabeth Irvine died without leaving any living children or descendants of any child who had died in her lifetime, the remainder created by the will never vested.

The next question is, where was the estate pendant upon the life estate of Mrs. Elizabeth Irvine during the contingency of the contingent remainder and until it was

determined that it would never vest? In Gray on Perpetuities (2d Ed.) sec. 11, it is said:

"A future estate may be indirectly created by giving livery of seisin for one or more life estates, without an ultimate remainder in fee. The estate remaining in the former owner ready to come into possession on the termination of the life estate or estates is a reversion. The same result is reached when an ultimate remainder in fee is contingent. Until it vests, there is a reversion in the feoffor and his heirs."

To the same effect is Bourbon Agricultural Bank & Trust Co. v. Miller, 205 Ky. 297, 265 S. W. 790; Brown v. McCommas, 195 Ky. 337, 242 S. W. 362.

Therefore, until the contingency happened which would turn the contingent remainder created by the will of David Irvine we have been discussing into a vested one, there was a reversion in David Irvine which either descended to his heirs, if he died intestate as to it, or passed to his residuary devisees, if the residuary clause of his will covered it. Brown v. McCommas, supra. This estate was a reversion and not a true possibility of reverter, which is an estate after an estate terminable by special or collateral limitations, such as an estate to A till B returns from Rome. A true possibility of reverter is not alienable. Gray on Perpetuities (2nd Ed.), secs. 13, 21. Gray in his book says that the statute of quia emptores, which put an end to subinfeudation, also put an end to possibilities of reverter, and that the same result should be reached in those states where the tenure of land is allodial as it is in Kentucky. See Kentucky Statutes, section 2338. But be that as it may, as the estate created for the children of Elizabeth Irvine was a contingent remainder and not an estate terminable by a special or collateral limitation, the estate after the life estate and until the contingency happened was a reversion and not a possibility of reverter. We do not regard it as important to determine whether this reversion passed to David Irvine's four children by the statute of descent (Ky. Stats., sec. 1393 et seq.) or by the residuary clause in his will. The result is the same in either case. These four children were his residuary devisees. They were also his only heirs and distributees at law. So that, in either case, they took this reversion.

By his will, David Irvine disposed of certain property located in Missouri. His devisees divided this property amongst themselves by executing deeds to each other. It is obvious that by these deeds the devisees conveyed to the grantees named in the deed all the title the grantors had in the property conveyed; so that what reversion the grantors had in the Missouri property passed to Mrs. Elizabeth Irvine under the deed conveying to her that property. It results that the appellants who must make such claim as they may have to this reversion in the Missouri lands, under the grantors of the deeds to such land, have no claim to it. The same result must follow as to the other property here in question, though it was not divided among the devisees by deeds. The agreement of August 22, 1872, to which we have referred, was a valid and binding agreement on those who were parties to it. Especially would this be so if that agreement were thereafter acted upon by the parties to it. It was acted upon, at least by Mrs. Elizabeth Irvine, who dealt with the property devised to her branch of the family in accordance with the provisions of the agreement. No party to that agreement after it had been entered into and at least after it had been acted upon by Mrs. Elizabeth Irvine could have repudiated it as to her. The elementary principles of contract and estoppel would have forbidden any such repudiation. Compare Walton's Adm'r v. Rogers, 188 Ky. 353, 221 S. W. 876. The appellants, so far as this reversion is concerned, must claim through the parties to the August agreement of 1872, and their rights can rise no higher than those of such parties. Those parties could not now have made any claim to this reversion, and hence neither can the appellants. It be-belonged to Mrs. Elizabeth Irvine, and passed according to the deed of herself to her brother David W. Irvine, that of her brother to her husband, and to the wills of her husband and herself. The appellants have no claim to it, and the lower court did not err in dismissing their claim.

Its judgment is affirmed.

Whole court sitting.