## Wintuska v. Peart et al.

(Decided February 27, 1931.)

S. Y. TRIMBLE and COLEMAN TAYLOR for appellant.

W. V. PERRY and LAWRENCE B. FINN for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

Wm. L. Peart, died testate, a resident of Simpson county, Ky., in February, 1923. By the first four clauses of his will, he directed that his debts and funeral expenses be paid, and he disposed of $3,000 in specific bequests. By the sixth clause of his will, he made his wife, Sallie M. Peart, executrix of his estate. By the seventh clause he requested his foster son, the appellant F. A. Wintuska, to advise with his wife in the settlement of his estate, and he bequeathed to Wintuska the sum of $250 for such services and in appreciation of the esteem in which he held him. The residue of the testator's estate was disposed of by clause 5 of the will, the construction of which is involved in this lawsuit. That clause reads as follows:

> "After satisfying the above specific devises, I will to my wife, Sallie M. Peart, the remainder of my entire estate of whatsoever it may consist whether realty, personalty or mixed, to use, manage and control as she may wish without any restrictions whatever, hereby investing her with full power to sell and convey by deed or otherwise any property herein willed to her. But when my said wife shall come to die, if she so desires, she may give or will one-half of

whatsoever of my estate then remains in her possession to the children of S. S. Phillips, Frank Phillips, Jennie Hines Phillips Larue and Mary Phillips, the remaining half to be divided equally to my two brothers, John W. Peart, and James A. Peart, and my two sisters, Lucy H. Peart and Ada B. Peart.''

Sallie M. Peart qualified as executrix under this will. She caused an appraisement of the estate of her husband to be made which she signed as an inventory, and on March 8, 1924, she made a settlement as executrix of her husband with the judge of the Simpson county court, showing the total receipts which came to her hands to be $14,586, and after paying the indebtedness, expenses, and special bequests, that she receipted for the residue of $9,327.35. In addition to this sum, she received $3,000 from a life insurance policy on the life of Mr. Peart. In January, 1926, Mrs. Sallie Peart died testate in and a resident of Logan county, Ky. By her will she directed the payment of her debts and funeral expenses, made a specific bequest of $5 to her brother, Sam S. Phillips, and devised the residue of her property to her foster son, the appellant F. A. Wintuska, a resident of St. Louis, Mo. After her death, two suits were instituted, one being brought by John M. Peart, Lucy H. Peart, Ada B. Peart, and the children of James A. Peart who had died in the meantime, to recover one-half of the estate of Wm. L. Peart on the theory that they were remaindermen under the proper construction of the fifth clause of Wm. L. Peart's will. The other suit was brought by the administrator with the will annexed of Wm. L. Peart to recover the other half of the estate of Wm. L. Peart on the theory that under a proper construction of the fifth clause of Wm. L. Peart's will, Sallie M. Peart took only a life estate with a special power of appointment as to one-half of said estate and she having failed to exercise that power of appointment, such half of the estate was undevised estate of Wm. L. Peart. Inasmuch as any recovery the administrator might make in his suit would go for the benefit of the same parties who were prosecuting the other suit as remaindermen under the will of Wm. L. Peart, the two suits were consolidated and prosecuted as one. The cases having been consolidated, the petitions and subsequent pleadings of the parties plaintiff are thereafter to be treated as those of each party plaintiff.

Strader v. Miller, 236 Ky. 637, 33 S. W. (2d) 668. In these suits, it was claimed that in order to defeat the remaindermen, the appellant Wintuska and Sallie M. Peart had converted certain Liberty bonds belonging to the estate of Wm. L. Peart, deceased, and which had come into the possession of Sallie M. Peart. For the value of these bonds they asked personal judgment against Wintuska and the estate of Sallie M. Peart in the sum of $8,250. An order of attachment was sued out and duly levied on certain property of Wintuska. By his answer, Wintuska took the position that by the fifth clause of Wm. L. Peart's will, Sallie M. Peart was devised a fee simple in the estate of her husband and that therefore the limitations over were void. He also denied any conversion on the part of Mrs. Peart or on his part of any of the estate of Wm. L. Peart. After proof had been taken, the court construed the will in accordance with the theory of the plaintiffs and further held that Mrs. Peart and Wintuska had conspired to convert and had converted the Liberty bonds belonging to the estate of William L. Peart to defeat the remaindermen. It gave judgment against the estate of Sallie M. Peart and Wintuska for $8,250 and sustained the attachment that had been sued out on his property. From that judgment this appeal is prosecuted.

The first question presented is as to the proper construction to be given to the will of Wm. L. Peart. The parties are agreed that where an estate is devised in fee, a gift over of what is left or not disposed of by the first taker is void. On the other hand, where only a life estate is given the first taker, the limitation over is valid. Does the estate which Wm. L. Peart devised to his wife fall within the first of these two classes or the second? Numerous cases involving the question whether the particular devise under discussion falls within the one class or the other may be found in our Reports and some of them have been very troublesome to decide. But out of the plenitude of decisions, there have emerged two controlling principles. The first of these is thus summarized in Sisson v. Sisson, 208 Ky. 843, 272 S. W. 15:

> "The pivotal question in every case is, Did the first devise take a fee or life estate? and one of the tests is, Was he given the unlimited power of disposition?"

The second principle, common to all cases of will construction, is that the intention of the testator as gathered from the will as a whole and from the language employed by the testator in writing it is to control, regardless of collateral and subsidiary rules which may be employed in arriving at such intention when its expression is obscure. Jones v. Jones' Ex'rs, 198 Ky. 756, 250 S. W. 92; State Bank of Eau Gallie v. Rose's Adm'r, 219 Ky. 562, 293 S. W. 1087; Walker v. Irvine's Ex'r, 225 Ky. 699, 9 S. W. (2d) 1020. In Greenway v. White, 196 Ky. 745, 246 S. W. 137, 139, 32 A. L. R. 1385, we said:

"It may be admitted that some of the earlier decisions, including, perhaps, some from this court, under the ancient common-law doctrine that there could be no limitation upon a fee, held that, where a will or other instrument of conveyance gave an estate absolutely to one with express or implied power of unrestricted disposition, the estate could not be reduced by any subsequent provision of the instrument, but the courts generally, including this one, have long since come to the conclusion that the rule requiring the intention of the maker, either of a will or deed, as gathered from the entire instrument, to prevail, overshadows and dispenses with the ancient technical, common-law rule, and that, where it appears from the entire language of the will or deed that it was the intention of the maker to limit the estate given or granted to less than an absolute one, that intention will prevail."

Applying these two principles to the devise here in question, we find that by it Sallie M. Peart was devised the residue of Wm. L. Peart's estate "to use, manage and control" as she might wish "without any restrictions whatever," and "with full power" on her part "to sell and convey by deed or otherwise" said property. The testator then provided that when his wife died she might, if she so desired, "give or will one-half" of the testator's estate then remaining in her possession to the children of S. S. Phillips; "the remaining half to be divided equally" among the testator's brothers and sisters. Do these provisions invest Sallie M. Peart with an unlimited power of disposition of the estate devised to her? Did the testator intend to invest her with such an

unlimited power? The unlimited power of disposition comprises not only conveyances inter vivos but also the power to dispose of by will if the devisee so wishes and as the devisee may wish. Now had Wm. L. Peart by this fifth clause of his will devised his estate to his wife "to use, manage and control as she may wish without any restrictions whatever . . . with full power to sell and convey by deed or otherwise" the property devised, any property not disposed of by her in her lifetime to go as the testator directed, the case would fall within the rule of Wells v. Jewell, 232 Ky. 93, 22 S. W. (2d) 414; Barth v. Barth, 38 S. W. 511, 18 Ky. Law Rep. 840; Plaggenborg v. Molendyk's Adm'r, 187 Ky. 509, 219 S. W. 438; Commonwealth v. Stoll, 132 Ky. 234, 114 S. W. 279, 116 S. W. 687; Becker v. Roth, 132 Ky. 433, 115 S. W. 761; Nelson v. Nelson, 140 Ky. 410, 131 S. W. 187; and of many others cited and relied upon by the appellant. In these cases, the devise is typical—the first taker is given the property to enjoy with full power to sell and convey by deed or otherwise (sometimes it is even stated that the taker may will the property devised), but whatever remains of the property undisposed of by the first taker at his death is to go as testator directs. It will be observed in such a devise that the power of disposition is not limited by any expressed words of the testator. The first taker is left free to dispose of the property as he may see fit, and the testator putting no express limitation on that power, we have held it to be a power to dispose of by will as well as by an inter vivos conveyance. The taker then is invested with all the attributes of a fee and, being so invested, is held to take a fee. Once this position is arrived at, it inevitably follows as those cases hold that the limitations over of what remains undisposed of by the first taker are void.

But the testator in the instant case did not phrase his will after the fashion of the devises typical to the cases just cited and discussed. He added thereto this provision: "But when my wife shall come to die, if she so desire, she may give or will" one-half of the testator's estate then remaining to the children of S. S. Phillips, but the other half of that estate is to go to the sisters and brothers of the testator. Can any one doubt that the testator by this provision clearly meant to restrict the power of disposition he had theretofore given to his wife

to a conveyance inter vivos? Can any one doubt that the manifest intention of the testator was that his wife should during her life enjoy his estate and use it even to the exhaustion of the principal for her needs and comfort as she might deem it necessary, but that when the sands of her life were exhausted, she should have but a very limited power to dispose of what was then left of the estate? Did the testator not say as clearly as could be said that his wife's power of disposition by will was confined to one-half of the estate and to a specially designated class, the children of S. S. Phillips? Did the testator not by the clearest of implications say that as to the other half of the estate his wife should have no power of disposition, but that the same should go to his brothers and sisters? We are clearly of the opinion that the manifest intention of the testator as gathered from the whole of the fifth clause of his will, that being the only part of the will which is pertinent to the present controversy, is that the power of disposition given to his wife was one inter vivos and that the power to dispose of by will was limited to one-half of the estate and to specially designated class. This being true, the power of disposition invested in Mrs. Sallie M. Peart was not such an unlimited power of disposition as to create a fee in her, since to do so such a power of disposition must be unlimited not only as to inter vivos conveyances but also as to a testamentary disposition. The case thus falls within the rule of Angel v. Woods, 153 Ky. 195, 154 S. W. 1103, 1104; Cox v. Glass, 214 Ky. 600, 283 S. W. 943; Knost v. Knost, 178 Ky. 267, 198 S. W. 917; Spicer v. Spicer, 177 Ky. 400, 197 S. W. 959, 960; Sisson v. Sisson, supra, and numerous other cases relied upon by appellee.

In Angel v. Wood, the devise was:

"After all my lawful debts and funeral expenses are paid and discharged, the residue of my estate, to my dearly beloved wife, . . . I give and bequeath all my estate, real, personal and mixed, of which I shall die possessed, or to which I maybe entitled. But at her death if there should be anything left after her funeral expenses are paid, and a nice substantial monument erected to her memory I wish half that is left to be given equally to my brothers or their heirs, the remaining half to be disposed of as she may see or think proper."

In holding that Mrs. Bowling took only a life estate with power of disposition during her lifetime, we said:

"In the will under consideration the devise to Mrs. Bowling and the limitation over occur in the same sentence. Had she been given the power to dispose of the devised estate both during her lifetime and at her death, we would necessarily have to hold that she took a fee; but such is not the case. The will expressly limits her right to dispose of the property by will. She is given power to dispose of only one-half. By giving her full power to dispose of the property during her lifetime, but limiting her power to dispose of it at her death, it is perfectly apparent that the testator did not intend to give her the property in fee, with the absolute power of disposition. We therefore conclude that this case falls within the rule laid down in Anderson v. Hall's Adm'r, 80 Ky. 91, and McClelland's Ex'r v. McCleland, etc., 132 Ky. 284, 116 S. W. 730. Our conclusion is further strengthened by the contemporaneous construction placed on this will by the devisee, Mrs. Bowling, and her husband's brothers soon after Dr. Bowling's death, a construction which seems to have been fully acquiesced in by all the parties up to the time of the granting of this appeal, which took place more than 30 years after the will was probated. We therefore conclude with the chancellor that Mrs. Bowling acquired in the property devised only a life estate, with power of disposition during her lifetime. There being on hand at her death a considerable portion of the devised estate, and she having power to devise only one-half thereof, the remaining half passed under the will to Dr. Bowling's three brothers."

It will be noted how closely this Angel v. Wood case parallels the instant case and especially in a fact, not heretofore noted, but to which we shall more fully refer presently, that the appellant and Mrs. Peart during Mrs. Peart's lifetime construed the will of Wm. L. Peart as appellees now contend should be done.

In the Spicer case, supra, we said:

"We are aware that a number of cases have been decided by this court in which it was held that where a will or deed in apt terms gives full or unqualified power of disposition to the devisee or

grantee named as taker of the title, the instrument will pass an absolute fee, and that any provision or devise over is absolutely void, for the reason that it is inconsistent with or repugnant to the fee, whether the power to dispose of the property shall have been exercised or not. Clay v. Chenault, 108 Ky. 77, 55 S. W. 729, 21 Ky. Law Rep. 1485; Dulaney v. Dulaney, 79 S. W. 195, 25 Ky. Law Rep. 1662; Barth v. Barth, 38 S. W. 511, 18 Ky. Law Rep. 840; Becker v. Roth, 132 Ky. 429, 115 S. W. 761; Ratcliffe v. Marrs, 87 Ky. 26, 7 S. W. 395, 8 S. W. 876, 10 Ky. Law Rep. 134. These cases however, are not inconsistent with the further doctrine, so often announced by this court, that:

" 'In construing a deed it will be read as a whole, and if, upon a consideration of the whole instrument, it appears that it was the intention of the parties to vest a less estate than a fee in the grantee, that intention will be carried into effect. And when the intention, as manifested in the language, is to convey a life estate with remainder over, there has been no disposition to defeat by construction the purpose of the grantor.' Harkness v. Meade, 148 Ky. 565, 147 S. W. 10; Wilson v. Moore, 146 Ky. 679, 143 S. W. 431; Lawson v. Todd, 129 Ky. 133, 110 S. W. 412, 33 Ky. Law Rep. 557; Atkins v. Baker, 112 Ky. 877, 66 S. W. 1023, 23 Ky. Law Rep. 2224."

We are therefore of the opinion that the construction put upon this fifth clause of Wm. L. Peart's will by the chancellor, to the effect that Sallie M. Peart took but a life estate with power of disposition during her lifetime as to the whole and a limited power of disposition as to one-half on her death in the estate of her husband, is the correct one, and that his judgment to that effect, and to the further effect that the limitations over being valid and Sallie M. Peart having failed to exercise the power of appointment as to one-half of the estate given her, the brothers and sisters of Wm. L. Peart were entitled to the one-half of the estate expressly devised and bequeathed to them and the administrator with the will annexed of Wm. L. Peart was entitled to the other half as unbequeathed estate of Wm. L. Peart is right and should be affirmed:

We come now to that branch of the case dealing with the alleged conversion by the appellant and Sallie M.

Peart of the Liberty bonds belonging to the estate of Wm. L. Peart. The appellant introduced no evidence on this or any other issue. The proof for the appellees was to this effect:

When Wm. L. Peart died, his securities consisted principally of registered Liberty bonds. On March 30, 1923, Mrs. Peart had the bank where these securities were being kept for safe-keeping send them in for exchange into coupon bonds which pass by delivery. When the coupon bonds were received from the transfer agent, they were again deposited with the bank for safe-keeping under the account of Mrs. Peart "as executor of the estate of Wm. L. Peart" and were so kept by the bank until July 7, 1924, at which time Mrs. Peart withdrew them. Shortly after Mr. Peart was buried, Mrs. Peart sent the appellant Wintuska and appellee's witness John F. Larue to Auburn, Ky., to see Mr. H. P. McCormack, who was president of the bank with which Mr. Peart transacted his business. The purpose of their visit was to ascertain whether Wm. L. Peart had left a will or not. Mr. McCormack produced the will, opened it, and read it. Wintuska and Larue returned to Mrs. Peart's home and informed her of its contents. On the next day Mrs. Peart, Wintuska, and Larue all went to Auburn to see Mr. McCormack, and when they got there, Mrs. Peart herself read the will. On the way over to Auburn and on the way back to her home, Mrs. Peart conferred with Wintuska about the will. They were both very dissatisfied with it. Mrs. Peart was not on good terms with Mr. Peart's family, and she did not want Mr. Peart's family to get anything out of Mr. Peart's estate. Wintuska and Mrs. Peart talked over the different ways that Mr. Peart's property could be disposed of in order that at her death none of his estate would be left. It was on this trip that Wintuska suggested to Mrs. Peart that she sell the registered bonds and buy coupon bonds or state warrants. He advised her expressly not to buy any real estate as the title to it would be of record. He further advised her to keep no record of anything she bought or had, to sell the home which she later did, and to procure a lock box in the Auburn bank to which she and he should have access and to put the securities in it. A few days later Larue heard another conversation between Mrs. Peart and Wintuska in which Wintuska told Mrs. Peart that he was going to put some money in the lock box for an oil lease that he wanted to buy on the farm Mrs. Peart

then owned. At that time he told her in case he died all she would have to do would be to open the box and get this money, and he told her that she could fix it so that her estate could be disposed of the same way. Thereupon they went to Auburn, rented a box, and the keys were delivered to them. Mr. McCormack has since died and hence could not be produced as a witness. During Mrs. Peart's last illness she resided in the home of Wintuska's mother and a nurse by the name of Amelia Mitchell waited upon her. In putting away some things, the nurse asked Mrs. Peart whether or not the trunk or dresser should be locked, and Mrs. Peart in substance told her that it was not necessary as all her valuable papers were in her lock box at the bank. It was about this time that the nurse observed the two keys to the lock box in the dresser drawer. A short time thereafter Wintuska came to see Mrs. Peart and the nurse heard Wintuska say to Mrs. Peart: "Miss Sallie, I am dropping the keys in the trunk," which he did. Mrs. Peart died very shortly thereafter and the keys to the lock box were found in the trunk. When the lock box was opened, nothing was found in it but a sheet of blank paper. It was further shown that Mrs. Peart was of a very saving disposition, very economical and lived very quietly. The doctor who attended her in her last illness was paid for each visit as he made them and as he left the house. Wintuska did not present any proof whatever to deny any of the facts as brought out by the appellee's proof. The chancellor found on this evidence that Sallie Peart had not used this estate for her convenience, comfort, support, or maintenance but that she conspired with Wintuska to convert this estate, and that in pursuance to said conspiracy Wintuska had converted it to his own use. We are of opinion that the proof supports the finding of the chancellor. It results, therefore, that the judgment of the chancellor is, in its entirety, correct, and it is affirmed.

Whole court sitting.