## Bonta, et al. v. Sevier, et al.

(Decided March 4, 1924.)

### Appeal from Boyle Circuit Court.

1. Wills—Court Properly Instructed that Testator must Know "the Natural Objects of his Bounty."—In will contest, on ground of mental incapacity, court properly instructed that a person is of sound mind if at the time of execution of his will he has such mental capacity as enables him to know "the natural objects of his bounty," etc., as against the objection that the instruction had the effect of misleading the jury into the belief that the testator's children and grandchildren were the only natural objects of his bounty.

2. Witnesses—Attorney Drawing Will May Testify as to Testator's Unsoundness of Mind, and Relate what Occurred.—Attorney who drew a will could testify in will contest that in his opinion the testator was of unsound mind at the time of the execution of the will, and relate what occurred at the time the will was executed, including statements made by the testator; such communications not then being privileged.

3. Wills—Admission of Evidence Held Harmless if Error.—In will contest, where propounders showed that at an inquest on the testator the jury returned a verdict "for the defendant," if it was error to permit the foreman of the jury to testify that the jury was of the opinion that the testator was of unsound mind but harmless and not dangerous, its admission was not prejudicial to the proponents, where the evidence was overwhelming that the testator was of unsound mind at the time he executed the will.

S. A. RUSSELL for appellants.

JOHN RAWLINGS, NELSON RODES, BAGBY & HUGUELY, HENRY JACKSON and GEORGE STONE for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

J. H. Bonta, a resident of Mercer County, died in the month of April, 1921. At the time of his death he was

confined in the Eastern State Hospital. His first wife died in the year 1887. To that marriage three children were born, to-wit, Jinkie Sevier, Henry Bonta, who died unmarried in 1914, and Charles Bonta, who died leaving a widow and four children. By his will, which was dated August 23, 1915, J. H. Bonta devised his farm to his second wife for life, then to his nephew, Robert Murphy, for life, then in fee to his nephew, William H. Bonta, son of his brother, C. C. Bonta, a resident of Oklahoma. Any surplus money after the payment of his debts, he bequeathed to his nephew, William H. Bonta. By other provisions he bequeathed to his daughter, Jinkie Sevier, $100.00, and to each of her four children, $100.00. He further stated in his will that he had given his son, Charles Bonta, a farm worth $10,000.00, and as his children would receive that, which was more than their share, he gave them nothing else.

The will was contested by the testator's daughter and grandchildren on the ground of mental incapacity and the jury found against the will. The propounders have appealed.

In the month of February, 1912, the testator, whc was a large man, became stuck in the opening of a cistern on his farm. His nephew, Robert Murphy, who lived with him, rushed to his assistance, but was unable to hold him. He fell to the bottom of the cistern and received a severe wound in his head. According to the witnesses for the contestants his mind was never right after that time, and they cited numerous instances of abnormal conduct on which their opinions were based. On the other hand, certain witnesses for the propounders testified that the testator's mind was sound at the time the will was executed.

After instructing the jury to find for the will unless they believed from the evidence that at the time of its execution the testator was not of sound mind, the court instructed the jury as follows:

(2) "A person is of sound mind in making a will if he, at the time of its execution has such mental capacity as enables him to know the natural objects of his bounty, his obligations to them, the character and value of his estate, and to dispose of it according to a fixed purpose of his own."

It is insisted that the use of the words, "natural objects of his bounty," was prejudicial in that the word "natural" had the effect of misleading the jury into the belief that the testator's children and grandchildren were the only natural objects of his bounty, and that he did not know his obligations to Mrs. Sevier and her children, as they received a smaller bequest than the children of his son, Charles C. Bonta. In the case of Rasdall v. Brush, 104 S. W. 749, the instruction read: "That he then had such mental capacity as to enable him to know the objects of his bounty, and the character and value of his estate, and to make a rational survey of his property, and to dispose of it according to a fixed purpose of his own." The judgment was reversed because of the omission of the word "natural" before the word "objects," and the further omission of the words, "and his duty (obligation) to them," and since that time we have steadily adhered to the rule that it is essential to the validity of a will that the testator should have such mental capacity as to enable him to know the natural objects of his bounty and his obligation to them. Meuth's Extrx. v. Meuth, 157 Ky. 784, 164 S. W. 63; Frye's Exor. v. Bennett, 189 Ky. 546, 225 S. W. 499.

Another contention is that the evidence of Colonel E. H. Gaither, who drew the will, should have been excluded. According to Colonel Gaither, the testator was of unsound mind at the time, and did not know his obligations to the natural objects of his bounty. Knowing the condition of his mind, he tried to put the testator off, but the latter insisted and told him that if he didn't write the will he would get somebody else to do it. He then told the testator that if he was determined to have a will written he would fix it up for him. The testator first told Colonel Gaither how badly his son-in-law had treated him, and he did not want him to have any of his property. Colonel Gaither suggested that he give his property to his daughter, but the testator said that would be the same thing. He then suggested that the testator give the property to his wife, but the testator objected because he said his wife would give it to his daughter. After talking a while, the testator said that he had a nephew in Oklahoma, and that he would just give him the property. He then added that there was a man out on his place, and he wanted to give him an interest in it

for life. Colonel Gaither then suggested that the grand-children had not done anything to him, and he said, "Well, I'll just give them $100.00 apiece." Thereupon Colonel Gaither dictated the will, but he and his stenographer both declined to witness it. Afterwards the testator got others to witness it.

While there is some authority to the contrary, the prevailing rule seems to be that, unless provided otherwise by statute, communications by a client to the attorney who drafted his will, in respect to that document, and all transactions occurring between them leading up to its execution, are not, after the client's death, within the protection of the rule as to privileged communications, in a suit between the testator's devisees and heirs at law, or other parties who claim under him. 28 R. C. L. sec. 141, p. 550; Glover v. Patten, 165 U. S. 394, 41 L. Ed. 760; Doherty v. O'Callaghan, 157 Mass. 90, 31 N. E. 726, 34 A. S. R. 258, 17 L. R. A. 188. In discussing the question of privilege as applicable to attorney and client in will contests, Professor Wigmore, in his work on Evidence, vol. 4, sec 2314, has the following to say:

"But for wills a special consideration comes into play. Here it can hardly be doubted that the execution, and especially the contents, are impliedly desired by the client to be kept secret during his lifetime, and are accordingly a part of his confidential communication. It must be assumed that during that period the attorney ought not to be called upon to disclose even the fact of a will's execution, much less its tenor. But, on the other hand, this confidence is intended to be temporary only. That there may be such a qualification to the privilege is plain. That it appropriately explains the client's relation with an attorney drafting a will seems almost equally clear. It follows, therefore, that after the testator's death the attorney is at liberty to disclose all that affects the execution and tenor of the will. The only question could be as to communications tending to show the invalidity of the will, i. e., from which a circumstantial inference could be drawn that the testator was insane, or was unduly influenced. It may be conceded that the testator would not wish the attorney to assist in any way the overthrow of the will.

But the answer is that such utterances were obviously not confidentially made with reference to the secrecy of the fact of insanity or undue influence, for the testator, of course, did not believe those facts to exist, and therefore could not possibly be said to have communicated them. As to the tenor and execution of the will, it seems hardly open to dispute that they are the very facts which the testator expected and intended to be disclosed after his death; and, with this general intention covering the whole transaction, it is impossible to select a circumstance here or there (such as the absence of one witness in another room) and argue that the testator would have wanted it kept secret if he had known that it would tend to defeat his intended act. The confidence is not apportionable by a reference to what the testator might have intended had he known or reflected on certain facts which now bear against the will.''

Though the question does not seem to have been decided by this court, the right of an attorney to testify in support of a will has been recognized in a number of cases, and if he may testify at all, no reason is perceived why he may not tell the whole truth, whether it be favorable or unfavorable to the validity of the will.

After the propounders had shown that at an inquest held on the testator in the month of July, 1915, the jury returned the following verdict, ''We, the jury, find for the defendant,'' the foreman of the jury was permitted to testify that the jury was of the opinion that the testator was of unsound mind but harmless and not dangerous, and that there was no reason why he should not be left at home for a while. Even if the foreman's evidence should have been excluded, yet in view of the overwhelming evidence of the testator's unsoundness of mind at the time the will was executed, we do not regard its admission as prejudicial.

Judgment affirmed.