## Hood et al. v. Nichol et al.

## Hood v. Martin et al.

(Decided May 30, 1930.)

(As Modified on Denial of Rehearing February 6, 1931.)

780

DAVID R. CASTLEMAN for appellants.

TRABUE, DOOLAN, HELM & HELM, NEVILLE MILLER and J. L. LONDON for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing in first case and affirming in second case.

On August 3, 1922, Jane Higgins died leaving her husband, William Higgins, then about 80 years of age, surviving her. They had been married a great number of years, but had never had any children. Mrs. Higgins had had three sisters and two brothers. The appellant, Mary A. Hood, a daughter of one of these sisters, had been the favorite niece of Mr. and Mrs. Higgins, had been reared in their home, and had been treated as their daughter. When she married, they purchased for her a home next door to the one in which they lived, in order that she might still be near them, and she and they continued on the terms of the utmost intimacy during the rest of the lives of her aunt and uncle. Indeed, after his wife's death, William Higgins closed his own home and went to live with Mary Hood and continued to live there until he died in the spring of 1927. After Jane Higgins died, her will was in due course of time probated. It read as follows:

"I, Jane Higgins resident of Louisville, Jefferson Co., Kentucky taking into consideration the uncertainty of life and the certainty of death do hereby make this my last will and testament in manner and form as follows, hereby revoking any and all wills heretofore made by me.

"1st. It is my will that all my just debts and funeral expenses be paid out of my estate.

"2nd. I will and bequeath to my beloved husband William Higgins all the residue of my property and estate of every kind and discription, (sic)

real, personal and mixed for and during his natural life togather (sic) with all the rents, profits and income thereof during said time.

"3rd. At the death of my said husband I will and direct that the property and estate of myself and husband remaining at his death be equally divided into two parts one half thereof to go to my descendents (sic) and heirs at law and the other one half to go to the descendents (sic) and heirs at law of my said husband or to such person or persons as by last will and testament he may appoint and determine.

"I hereby constitute and appoint my beloved husband William Higgins Executor and Trustee of this my last will with power to sell any of my real or other estate as he may deem best for the benefit of my estate and make and deliver deeds or other acquittances therefor and in case of such sale or sales the purchaser need not care for the subsequent investment of the purchase money or have anything to do therewith.

"It is my will that no surety of any kind be required of my said husband upon his official Bonds and that no inventory or appraisement of my estate be made or returned into Court.

"In testimony whereof witness my hand this 15th day of February, 1913.

"Jane Higgins."

William Higgins qualified as the executor of his wife's estate and undertook its admistration. He reduced it all to cash, it amounting to about $27,000. Just what he did with the proceeds is not clearly established by this record but it is practically admitted that he did away with them all. He also owned himself at the time his wife died several pieces of real estate, but by October, 1924, about all the real estate he had left was a tract of land on the southwestern outskirts of the city of Louisville, known in this record as the "Boulevard Property." At that time it was not of great value, but it was expected that the Western Boulevard, now called Algonquin Boulevard, would be constructed through or near it, as indeed it was, and that when that was done its availability, not only for residential sites, but also for industrial establishments, would in a short course of time make it quite valuable. On October 7, 1924, William Higgins con-

veyed this "Boulevard Property" by deed of general warranty to the appellant, Mary A. Hood. The deed was prepared by some one in the office of the Louisville Title Company at the direction of Mr. Higgins, who had the deed recorded at his own expense. In the summer of 1925, Mrs. Hood made a trip to Europe, the trip being a gift of her uncle, William Higgins. She returned in September, 1925, and on September 9th of that year she executed a deed reconveying the "Boulevard Property" to Mr. Higgins. Whether there was a delivery of this deed or not is in serious dispute in this case. We shall discuss that question later on. In the early part of 1927 one of the nephews of Jane Higgins brought this suit against William Higgins and Mary A. Hood with the object, first, of having the will of Jane Higgins construed to the effect that William Higgins was by its terms put to an election of enjoying his own property on the same terms and conditions as he was to enjoy his wife's property under her will or, if unwilling to do so, of renouncing that will; secondly, of having it declared that William Higgins had elected to take under his wife's will and by so doing had circumscribed the fee-simple title he owned in his own real estate; thirdly, of having it held that, after William Higgins elected to take under his wife's will, he thereafter held both the property of Jane Higgins devised by that will and his own property in trust for the beneficiaries designated in Jane Higgins' will and to have it adjudged that Mary A. Hood under the conveyance of October, 1924, held the "Boulevard Property" on the same trusts as declared in Jane Higgins' will. When this suit was brought, the plaintiff was in ignorance of the deed of September, 1925. By the suit, it was also sought to have the October, 1924, conveyance set aside because of lack of mental capacity on the part of William Higgins to make it and because of undue influence practiced upon him by Mary A. Hood in its making. It was also sought to have William Higgins removed as trustee under his wife's will and for an accounting of his management of that estate. Immediately on the filing of this suit the plaintiff gave notice to take the depositions of Mary A. Hood, her husband, Dr. J. C. Hood, and William Higgins as if under cross-examination. Mary A. Hood and her husband gave their depositions, but William Higgins was unable to do so on account of his then mental condition. Within a few days thereafter, by an agreed

order, William Higgins resigned as trustee under his wife's will, and the Fidelity & Columbia Trust Company was appointed in his stead. While this suit was thus being vigorously pressed, Mrs. Hood and Mr. Higgins discharged the attorneys they had employed to represent them and employed the late Hon. Matthew O'Doherty in their place. In February, in company with Mrs. Hood, Mr. Higgins made a visit to the office of Judge O'Doherty for the purpose of having Judge O'Doherty draw a will for him making Mrs. Hood his sole beneficiary. Judge O'Doherty informed the couple that, on account of this suit which attacked Mr. Higgins' mental capacity, a will would be open to vital attack, and he suggested that the same result could be reached by having Mr. Higgins adopt Mrs. Hood as his heir at law. This met the approval of Mrs. Hood and Mr. Higgins. In a few days thereafter an ex parte petition, as provided by the statute, was filed by Mr. Higgins seeking to adopt Mrs. Hood. Notice of this was given to the plaintiffs in this suit, the original plaintiff having been joined by other heirs of Jane Higgins. They appeared on the morning of the hearing of the adoption proceedings and sought to intervene, but Judge Barret, before whom these proceedings were pending, declined to permit them to do so. After a short hearing, Judge Barret held that Mr. Higgins had mind enough to know what he was doing, and signed the order of adoption. Shortly thereafter, the plaintiffs did take the deposition of Mr. Higgins, but, as Mrs. Hood's counsel admits, the mental condition of Mr. Higgins was such that he could not even be cross-examined, and he was unable even to sign the deposition after it had been written out. Mr. Higgins died shortly after he gave his deposition, leaving a number of heirs who have become parties to this litigation. In the meantime, the plaintiffs, having discovered about the deed of September, 1925, set up by their reply, fairly construed, a claim to the effect that this deed reinvested William Higgins with title to the "Boulevard Property," or at least that Mrs. Hood held the "Boulevard Property" under an express trust for the benefit of William Higgins for his life, and, on his death, on the trusts set out in the will of Jane Higgins. After the death of William Higgins, the plaintiffs brought another suit to set aside the order of adoption on the grounds of lack of mental capacity on the part of Mr. Higgins and of undue influence on the part of Mrs.

Hood. Mrs. Hood, by her answer in the first case, stood on the deed of October, 1924, and asked that her title to the "Boulevard Property" be quieted. As to the suit to set aside the order of adoption, Mrs. Hood stood upon a traverse of the allegations of the plaintiffs. After elaborate preparation and a full hearing, the chancellor set aside the order of adoption on the ground that it had been procured by the undue influence of Mary A. Hood, adjudged that William Higgins could do as he pleased with his own property during his lifetime, but that Mrs. Hood held title to the "Boulevard Property" under the express trust relied upon by the plaintiffs in their reply and dismissed the other claims of the plaintiffs.

From the judgment setting aside the order of adoption, Mrs. Hood has appealed, and from the judgment decreeing that Mrs. Hood held the property under an express trust and dismissing the other claims of the plaintiffs, both parties have appealed, in so far as such judgment adversely affected them. The two appeals will be disposed of in this single opinion.

The first question which confronts us is whether, under Jane Higgins' will, William Higgins had a right during his own lifetime to do as he pleased with his own property, or was his title cut down to such title as he had in the property of his wife under her will. That William Higgins took, held, and enjoyed the property of his wife devised and bequeathed to him by her will is admitted, and that by so doing he elected to abide by the terms of that will cannot be denied. It is conceded that Jane Higgins by her will at least undertook to govern the disposition of such property of her husband as he owned at the time of his death, and, that having been put to the election of whether he would take under her will or renounce it and having elected to take under her will, William Higgins was bound by the terms of that will as to the disposition at least of the property he owned at the time of his death. But did the will of Jane Higgins circumscribe his absolute ownership of his own property during his lifetime?

By the third clause of her will, Jane Higgins devised the "property and estate of myself and husband remaining at his death" to the designated beneficiaries. On the first reading of this provision, the mind is struck with the thought that Jane Higgins was not undertaking to control any part of her husband's property, except such

as might be "remaining at his death." This would leave him free to do with it as he pleased during his lifetime. And a more thorough study of the will confirms this first impression. By the second clause of this will, the testatrix creates a life estate for her husband in "*my* property and estate." She says nothing expressly about cutting her husband's interest in his own property down to a life estate during his lifetime. In the latter part of the third clause of her will, she invests her husband as her executor and trustee with power to sell any of *her* property for the benefit of *her* estate. Thus she realized that no doubt circumstances would arise after her death which would dictate the sale of her real and personal property in order that advantage could be taken of increased values, or that precautions could be taken against shrinkage in values. Her husband's property would be subjected to the same contingencies during his lifetime, and, if she had intended to cut down his interest therein to a life estate, would she not have given him some such power of sale of his property as she did with reference to her own estate? That she gave him no such power is a cogent argument that she did not intend by her will to affect her husband's interest in his own property during his lifetime.

Further, it is the rule that, where a will is vague to the extent that it is susceptible of two constructions—one making it operate upon the property of the testator as well as property he did not own, and the other confining it to the property of the testator—the latter construction will be adopted for, as said in Lane v. Gess' Adm'r, 223 Ky. 448, 3 S. W. (2d) 1076, 1077: "It is the general rule that a testator is presumed to devise only his own property, or property over which he has power of disposition."

In 28 R. C. L. p. 331, the rule is thus expressed: "In order to make a case of election, it is well settled that the intention of the testator to give that which is not his own must be clear and unmistakable. It is not, however, necessary that such intention should be expressly declared, but it may be gathered from the whole and every part of the instrument."

In Elliott's Adm'x et al. v. Presbyterian Church of Bardstown et al., 215 Ky. 149, 284 S. W. 1029, 1030, where the testatrix, who owned three-fifths of a certain property, devised by her will "my more than two-thirds inter-

est'' in that property to her sister, it was held that the sister was not put to an election, since it was not clearly shown that the testatrix intended to dispose of a greater estate than she owned. In defining and applying the rule, we said: ''It is the rule that where the testator owns property jointly with another, and his intention is not clear, the courts incline to the interpretation that he intended to devise only his own interest, and there is no necessity for an election upon the part of the other owner who receives a benefit under the same will. But if words of description are used in indicating a specific gift of the property an election becomes necessary. Brossenne, etc., v. Schmitt, 91 Ky. 465, 16 S. W. 135, 13 Ky. Law Rep. 26. If the will had specifically defined the interest devised, a different question would be presented; but such is not the case. The words of the will are, 'My more than two-thirds interest in the home place.' They do not fix, but merely estimate, the interest devised. It is at once apparent, therefore, that the language of the will is too vague and indefinite to justify the inference that the testatrix intended to dispose of a greater estate than she actually owned, and therefore insufficient to require an election on the part of the devisee.''

Under these authorities, it is clear that we must construe the will of Jane Higgins as affecting her husband's estate only in so far as her intention can be clearly and unmistakably ascertained from her will as a whole. And such a rule of construction constrains the view that she intended only to control her husband's estate to the extent of what was left when he died, leaving him free to do with it as he wished in his lifetime. The case of Allen v. Boomer, etc., 82 Wis. 364, 52 N. W. 426, 427, relied upon by the apppellees, is clearly distinguishable. The will of Mrs. Allen involved in that case read:

> ''I bequeath to my husband, Edward Allen, my entire estate, both real and personal, of every name and nature. . . .
> ''I further bequeath out of my and my husband's property such sum as may be necessary for the support and education of Charity Wyman and Maud Wyman, daughters of Jason Wyman, and Fred L. Allen, until they shall be twenty-one years of age, according to the mutual agreement between me and my husband, as is expressed in his will.
> ''I further will and bequeath that after my death all the property that shall be left that was

mine or my husband's shall be divided between his and my legal heirs, one half to his heirs and one half to mine.''

Under this will, the Supreme Court of Wisconsin held that, Edward Allen having elected to take under his wife's will, his interest in such property as he owned at the time of the death of his wife and during his lifetime was cut down to a life estate. But it will be noted that, by the second clause of the will involved in this Allen case, the testatrix provided for the support and education of certain designated beneficiaries out of the property of her husband as well as her own, and that the provision for the contribution for such support and education to be made by her husband's estate took effect at once on the death of the testatrix and during the life of her husband. Thus there was disclosed a plain intention on the part of the testatrix to control her husband's estate in his lifetime as well as after his death. But there is no such analogous provision in the will of Jane Higgins. The chancellor held that William Higgins could do as he pleased with his own property during his lifetime, and in this construction of the will of Jane Higgins we concur.

The next question presented by these cases is whether or not the evidence establishes either that the deed of October, 1924, was procured from William Higgins by Mary A. Hood through the exercise of undue influence practiced upon him by her, or that William Higgins when he executed that deed did not have sufficient mental capacity to do so. The chancellor found both of these issues in favor of Mrs. Hood, and we concur in his finding. There is a dearth of evidence to support the appellees in their contention of undue influence, and there is an abundance of evidence to support the appellant in her contention that William Higgins had sufficient mental capacity in 1924 to execute the deed of October of that year.

However, did Mrs. Hood hold the title to the "Boulevard Property" conveyed to her by the deed of October, 1924, under an express trust, the terms of which were that William Higgins during his lifetime should be the cestui que trust, and, on his death, the beneficiaries as set out in the third clause of Jane Higgins' will should be the cestuis que trustent? The chancellor so held.

Of course, the trust with which the chancellor found the "Boulevard Property" impressed arose either at the time of the conveyance in October, 1924, because of conditions then imposed by the grantor William Higgins, or, if not at that time and that conveyance was an outright one free from any trust conditions, then at some subsequent time because of a declaration of trust on the part of Mrs. Hood. Let us assemble all of the evidence bearing on either of these contingencies. The deed of October, 1924, was a voluntary conveyance. William Higgins had it recorded at his own expense. He was then living with Mrs. Hood whom he loved and regarded as a daughter. In the following summer, he gave Mrs. Hood a trip to Europe. Undoubtedly the separation from her and the thoughts of the perils of sea and of land called to his mind the uncertainty of human life and the thought that, while the old must die, the young may die also, and the "wisest knoweth not how soon." So, on her return in the fall of 1925, he had her execute the deed of September, 1925, which she readily and without objection did. This deed was never recorded. Whether it was delivered and on what conditions, if any, we shall presently discuss. The plaintiffs produced and filed a copy of the following letter:

"Louisville, Ky., September 7, 1925.

"Mrs. Mary A. Hood, Louisville, Ky.

"Dear Mary: When I made you a deed for the Boulevard property, it was because I wanted to take no risk in having to sell it until we were ready. If anything happened to me while I was holding it, it would be sold on my death and it would be sold at a sacrifice. To prevent this I deeded it to you so that if necessary you could hold it for two or three years or until such time as you get a fair price for it. I should have had you make a deed to me for this so that in case anything happened to you, the property would come back to me and not be sold on your account. I am in hopes that there is no danger of this, but there is no telling what will occur. I am just writing this so that you will know just how I feel about this. If it is not sold until after my death, I want you to make a deed of trust to Mrs. Martin for $10,000.00, as you know I want this property when sold to be divided equally among your Aunt Jane's heirs and mine, but I can't go far enough to

say how I want it divided. We will have to settle on that later.

"I have made over the stock in the Higgins Land & Mining Company to you after my death. This stock controls the Mining Company at Joplin of 52 acres and the Nevada of 220 acres, which we are in hopes will turn out to be worth something. Should you have a chance or occasion to sell either you can do so under the Higgins Land and Mining Company charter as the Company owns the two pieces.

"Very truly yours,
"Wm. Higgins."

Mrs. Hood denied, in effect, that she received this letter. Two days after its date she executed the deed of September, 1925, The plaintiffs also produced and filed the following letter:

"Sept. 22, 1925

"Mr. M. J. Burke, 4141 W. Pine Blvd., St. Louis, Mo.

"Dear Mike: I arrived here this morning all right, and found everybody well. I am sending you enclosed stock of the Higgins Leather Co., also a copy of the deed I made to Mary Hood and the letter I dictated to her. When you look over this and if you have any suggestions of a new paper, send me copy of what you think would be better.

"I told you I thought I had the stock of the Higgins Land and Mining Co. here, but I don't find it. I have the certificate and stubs. Now I may have taken them over to St. Louis thinking I had the Higgins Leather Co. stock. If that is the case, they would be in the safe. Ask Catherine to look and see if she can find them and if she does, send them to me.

"I hope you got through the day quietly. I don't know of anything more to write you until I have another look about my stock. I hope you can get along all right.

"Yours very truly,
"Wm Higgins."

This letter to M. J. Burke does not say that "a copy of a letter heretofore written to Mary Hood" is therewith inclosed, but "the letter I dictated to her. When you look over this and if you have any suggestions of a

new paper, send me a copy of what you think would be better." This letter is dated September 22, 1925, and tends strongly to corroborate Mrs. Hood in her statement that she did not get the letter dated September 7, 1925. That letter was evidently inclosed in the letter of September 22, 1925, to M. J. Burke for his consideration and suggestions as to a better document that might be sent Mrs. Hood. It is strange that William Higgins said nothing in this letter of September 22, 1925, about the deed of September 9, 1925, reconveying him the property. He was careful to send a copy of the deed of October, 1924. Why did he not apprise his nephew, M. J. Burke, of the deed of September, 1925? It appears in the evidence that Higgins had visited his relatives in St. Louis, where his nephew, M. J. Burke, lived, during the summer of 1925. The letter of September 22, 1925, points to a discussion of these matters between Burke and William Higgins during the summer of that year and before Mrs. Hood's return from Europe.

The plaintiffs also produced and filed another letter from William Higgins to M. J. Burke. It reads:

"Louisville, Ky. November 23, 1925.

"Mr. M. J. Burke, 4141 W. Pine Blvd., St. Louis, Mo.

"Dear Mike: I have yours of the 20th with check (of Higgins Leather Co.) I hope you will not stop sending these to me, in fact, I would like to get one from you every week anyhow.

"Some time ago I sent you a copy of a letter I had written to Mrs. Hood in regard to the property deeded to her on the Boulevard. You failed to return it to me. I wish you would do so as I may want to make some changes in it and the sooner I do it the better.

"Yours very truly,

"Wm. Higgins."

This letter strengthens the view that the letter of September 7, 1925, had never been sent to Mrs. Hood. Indeed, it had not been returned by M. J. Burke to Higgins so late as the date of this November letter. And evidently it had then never been sent to Mrs. Hood, for Higgins expressed the wish to make some changes in it —a thing he could not have done to a delivered letter, although of course he could have written another letter

incorporating other wishes. He still is silent as to the deed of September, 1925. We cannot say, in the light of Mrs. Hood's denial that she ever got this letter of September 7, 1925, that the evidence shows she did. We are confident that she never received it prior to the execution of the deed of September 9, 1925. There is also filed by stipulation the following letter.

"Tuesday, Dec. 21st, 1926.

"My dear Rose: Would have answered your letter sooner, but have had a dreadful cold, and felt very bad. Am sorry you have had such a time yourself.

"Uncle has been feeling pretty good, but thinks he would not like to go to St. Louis while it is so cold. He was awful glad to see Alma and enjoyed the trip to Bardstown with them.

"Rose, the property Uncle turned over to me, is a piece of land outside the City limits. If that property were sold now, it would not bring anything. They were talking of making the boulevard through it, and if so, at some time may be sold for something. You must remember that Uncle has used up the money that Aunt Jane left his heirs. That will have to come out of that property first when sold. Uncle told me at one time, he took about $20,000 over to St. Louis, also said he has spent at least 5 or 6 thousand dollars for Drs., Hospitals, operations, drugs, and the like. He also lent Rush James $1,500 and I think their estate when Aunt Jane died, was about $27,000 dollars. You can see where it has gone. I am in no position to sign any paper, or promise anything, but will do the best I can. I hope you will not feel hurt, but when Uncle goes, he will leave very little behind.

"Uncle is sending a remembrance to you and Gertrude, 10 dollars a piece. Am putting in a little thought for you. I wish it were more. You have always been so sweet to remember us in your prayers.

"I hope you will soon be strong again and will all have a happy Christmas. And the New Year will bring many good things for you.

"Uncle joins me in sending love to all.

"Devotedly,

"Mary."

The chancellor relied strongly upon this letter, saying in his opinion: "Her (Mrs. Hood) letter to Higgins' niece in St. Louis is an express declaration of the trust upon which she held the property."

And now we come to the testimony of William Mix, a lawyer of character and ability of the Louisville bar. Mr. Mix had, for a number of years, been the personal attorney of William Higgins, and continued such until his discharge after this litigation began, as we mentioned in the early part of this opinion. Mr. Mix testified that, on Mrs. Hood's return from her European trip, Mr. Higgins "was discussing this tract of land with me; and he told me that Mrs. Hood had executed to him a deed for this property. And he told me his purpose in obtaining that deed was that in the event that Mrs. Hood should die before he did, that he wanted to have that property as his own; and that in the event that he died before she did, then the property was to be hers. That was his purpose as he expressed it and told it to me.

"16—At the time that he made those statements to you, was he seeking any advice from you with respect to them? A—Well, it is hard for me to answer that exactly, because I know pretty near everything Mr. Higgins talked to me about was as a lawyer, and the information that he gave me, while I had nothing to do with either one of the transactions, the conveying of the property by Mr. Higgins to Mrs. Hood, or Mrs. Hood to him; at the same time, he discussed it with me as his lawyer, and I think on one or two occasions, Mrs. Hood was present.

"17—Now, Mr. Mix, at the time that he made those statements to you, what was his particular business which he was then transacting with you? A—Well, the first time that he mentioned about the conveyance of this property, I was preparing a will for him, and I had known that he owned this property; and when it came time to prepare his will, I asked him about this particular piece of property, and he then told me that he had conveyed that property to Mrs. Hood, that he did not any longer own it. I then made a will for him and he signed it. This will was changed on one or two different occasions I know. Twice, I am positive, he made changes in minor details. Then afterwards, he told me that he had destroyed the will because he had nothing to

leave, and there was no necessity of him having a will.

"17 (sic)—At the time that he consulted you for the purpose of making his will, and made this statement to you, was the property that he had conveyed to Mrs. Hood referred to in the will or made a part of the subject-matter in any way? A—It was not."

Was this testimony of William Mix competent? The chancellor held that it was and correctly so. It is the prevailing rule, unless otherwise provided by statute, that communications by client to the attorney who drafted his will in respect to that document and all transactions occurring between them leading up to its execution are not, after the client's death, within the protection of the rule as to privileged communications in a suit between the testator's heirs or devisees or other parties who claim under him. It was expressly so decided in the case of Bonta et al. v. Sevier et al., 202 Ky. 334, 259 S. W. 703. The reasons for the rule, as developed by Wigmore in his work on Evidence, vol. 4, sec. 2314, are set forth in that opinion. See, also, the elaborate annotation and collection of authorities on the point in 64 A. L. R. 184 et seq. The transactions had between Mr. Mix and William Higgins were with reference to the drafting of his will. The present controversy is between the heirs at law of William Higgins and those who claim under him. It follows that the testimony of Mr. Mix set out does not come within the protection of privileged communications. This is all the evidence in the record bearing on this question of a trust vel non. From this resume, it may be seen that there is no direct evidence as to what took place between William Higgins and Mary A. Hood at the time of the conveyance of October, 1924, and, if the evidence does establish that a trust was then created, it does so solely by inference. That conveyance was an outright one. To turn it into one upon trusts, the plaintiffs must rely upon what inferences can be drawn from the two letters of Higgins to Burke, the letter of Mary A. Hood to Rose, and the reconveyance of September, 1925. That Mrs. Hood is supported in her statement that she never got the letter of September 7, 1925, addressed to her, we have already seen. This letter which Higgins sent to Burke cannot be reconciled

with his statements made to Mr. Mix at the time he was having Mr. Mix prepare his will. If, when he conveyed this property to Mrs. Hood, he had imposed trust conditions upon the property, what was the need of writing the letter of September 7, 1925? Why did he send that letter addressed to Mrs. Hood to Burke on September 22d after Mrs. Hood had executed the conveyance of September 9, 1925? Why did he not tell Burke in that letter of September 22d of the reconveyance? All this tends strongly to the view that when Higgins was in St. Louis he had been pressed by his St. Louis kin with reference to this "Boulevard Property," and that those letters were an effort to satisfy them or at least to keep them quiet. If Higgins had conveyed this property in October, 1924, upon trusts, and he wanted a declaration upon the part of Mrs. Hood to that effect, the more natural thing for him to have done would have been to have secured from her such declaration in writing. He had no difficulty in obtaining from her the deed of September, 1925. This shows her readiness to comply with his wishes. He could no doubt have as easily procured a declaration of trust if the reconveyance of September, 1925, was not for the purpose of which he informed Mr. Mix, as is more fully set out hereafter. If that purpose as related to Mr. Mix was the true one for the reconveyance, then the conveyance of October, 1924, was an outright one, and the reconveyance of September, 1925, was solely to protect Mr. Higgins in the event Mrs. Hood predeceased him. At the best, the letter of Higgins addressed to Mrs. Hood sent to Burke does no more than to demonstrate either a change of mind upon his part since the conveyance of October, 1924, or a purpose he entertained at the time of the conveyance which he did not then communicate to Mrs. Hood and of which there is no evidence in this record he ever communicated to Mrs. Hood. There could have been no necessity for the letter of September 7, 1925, had all these matters been agreed upon at the time of the conveyance in October, 1924. If there was a trust and he wished a memorial of its terms, the more natural thing to have done, living in the house with Mrs. Hood as he did, would have been to have procured from her a declaration of trust rather than to write her such a letter as this. Why have her execute an outright reconveyance, as he did on September 9th, if he still wished her to hold the property in trust? But, says the plaintiffs, did not Mrs. Hood in her

letter to Rose acknowledge the trust? We do not so read the letter. Mrs. Hood expressly refuses to commit herself about this property, but does admit that, as Mr. Higgins had used up all the money and property his wife had left, his property on his death would have to make good what he had thus used of his wife's estate. She recognized that he could not give his property to her free from such an obligation. This letter was undoubtedly an acknowledgment on the part of Mrs. Hood that the ''Boulevard Property'' would have to make good what her uncle had used of his wife's estate, but it cannot be spelled out into the trust the plaintiffs now seek to impose upon that property.

We are therefore of the opinion that the evidence wholly fails to establish that the deed of October, 1924, was otherwise than an outright conveyance. Did it establish that thereafter Mrs. Hood made an express declaration of trust? What we have said above concerning the letter to Rose disposes of this contention. Further, any such declaration of trust would have to be in writing in which her husband joined, and this is the only writing relied upon. Since Mrs. Hood's husband did not join in the alleged declaration of trust relied upon, it can have no binding effect. Kentucky Statutes, sec. 2128. In Ricks v. Wilson, 154 N. C. 282, 70 S. E. 476, 477, where this question was presented, the court said:

''Assuming that the vague expressions uttered by the wife on the occasion were sufficient to impress a trust upon the land in the hands of her son, which we do not admit, a woman under coverture cannot create a trust by parol or in any other manner except by embodying it in a written instrument, with her husband's consent to which her privy examination must be taken as required by our law. . . . She can only dispose of or incumber her real property in the way prescribed by the Constitution and statute law of the state.

''It not only follows as the logical result of our many and uniform decisions, but it is held elsewhere, and stated by text-writers, that a married woman cannot, where her legal status and right to convey is regulated as in this state, create a parol trust in land, that to do so would be but a subterfuge to evade the provisions of the statutes protecting her. . . .

"This is based upon the theory that the creation or declaration of a trust in lands is a conveyance of an interest therein. Hence the same reason which renders the deed of a married woman void as a conveyance of the title would render void an attempted declaration of a trust by her. This is held by the courts in states having statutes similar to ours. Tatge v. Tatge, 34 Minn. 272, 25 N. W. 596, 26 N. W. 121; Graham v. Long, 65 Pa. 386; Purcell v. Goshorn, 17 Ohio 105, 49 Am. Dec. 448."

We are therefore of the opinion that the trust theory upon which the chancellor decided this case cannot stand, and that the plaintiffs have failed to establish any such trust as they now rely upon.

This brings us to a consideration of the question whether by the deed of September, 1925, Mrs. Hood reinvested Mr. Higgins with the title to the Boulevard property. Was there such a delivery of that deed as that the title of the property passed from Mrs. Hood to Mr. Higgins? The word "delivery" may mean in its looser sense merely the transfer of the manual possession of a deed. But, in order for title to the property covered by the deed to pass, delivery must mean, not only the transfer of the manual possession of the deed, but also an accompanying intention of passing the title. Brandenburg v. Botner, 221 Ky. 7, 297 S. W. 702. In the instant case, after Mr. Higgins' death, the deed of September, 1925, was found with his other papers, including some liberty bonds, in an envolepe which had been placed and kept in Mrs. Hood's safety deposit box at the United States Trust Company. The only competent evidence bearing on how this deed came to be in that envelope was that given by Mrs. Hood, who testified:

"Q. Do you know where he (Mr. Higgins) keeps his valuables? A. Yes, sir, what valuables he has are in the United States Trust Company.

"Q. In whose box? A. My box.

"Q. Did you place them there? A. No, sir; he placed them there.

"Q. Are they set aside and marked with his name? A. I think they are. . . .

"Q. This deed was the deed that Mr. Higgins requested you to keep for him? A. Yes, sir.

"Q. You kept it in your box with his papers? A. Yes, sir.

"Q. It was kept with the Liberty Bonds you have testified regarding, and also the note for $3,-000.00? A. Yes, sir.

"Q. These papers were all kept together? A. Yes, sir. . . .

"Q. Did he give you any other writing of any kind at the time he asked you to put that in your box for him? A. No, sir."

From this testimony the chancellor concluded that a transfer of the manual possession of the deed from Mrs. Hood to Mr. Higgins had taken place. We agree. But with what intention was that transfer accompanied? It may be true, as argued by the plaintiffs, that, such a transfer having taken place and the deed being found in the possession of the grantee, a presumption of a delivery of the deed, meaning thereby, not only a transfer of possession, but an accompanying intention of passing title, had taken place. But such a presumption is not conclusive, and the true state of facts is open to establishment. Ball v. Sandlin, 176 Ky. 537, 195 S. W. 1089.

All the evidence bearing on the question as to what the intention of the parties was with reference to this deed is contained in a very short excerpt from the testimony of Mrs. Hood and a longer excerpt from that of Mr. Mix. Mrs. Hood said:

"Q. Didn't he have a deed filled out and ask you to sign it, conveying it back to him? A. In case of my death.

"Q. Did he? A. Yes, sir."

And Mr. Mix said:

"A. He told me that he had deeded this tract of land to Mrs. Hood. That was after the conveyance had been made to her, but I had nothing to do with the transfer, and did not know of it. It had been done as before stated.

"15. Go ahead. A. Some time after that, and I remember that it was after, I think, Mrs. Hood made a trip to Europe and came back, he was discussing this tract of land with me; and he told me that Mrs. Hood had executed to him a deed for this property. And he told me his purpose in obtaining that deed was that in the event that Mrs. Hood

should die before he did, that he wanted to have that property as his own; and that in the event that he died before she did, then the property was to be hers. That was his purpose as he expressed it and told it to me.''

As heretofore quoted, Mr. Mix also testified that ·Mr. Higgins told him that he had nothing to leave by a will, and that he told Mr. Mix this after Mrs. Hood's return from Europe.

From this resume, we conclude that the intention of the parties at the time Mrs. Hood transferred the manual possession of the deed from herself to Mr. Higgins was that' it was not to take effect as a deed, unless she died before he did, and that there was no intention of presently passing the title.

It is asserted in many of the cases that a deed absolute on its face cannot be ''delivered'' to a grantee therein named to be by him held in escrow, and that such a delivery will operate as an absolute delivery and free from all parol conditions, and title will vest at once. See City National Bank of Cairo, Ill. v. Anderson, 189 Ky. 487, 225 S. W. 361. This is the traditional statement of the rule. Can it be reconciled with the results reached in Brandenburg v. Botner, supra; Ball v. Sandlin, supra; Sullivan v. Bland, 215 Ky. 57, 284 S. W. 410; Sutton v. Gibson, 119 Ky. 422, 84 S. W. 335, and others? In these cases, the possession of the deed was intrusted to the grantee; but, as there was no intention of presently passing the title, and it was understood that title was not to pass until some condition had been satisfied, it was held in each case there had been no delivery. No doubt the distinction between the two lines of cases lies in what Williston calls that ''somewhat fine'' distinction ''between delivery in escrow to the obligee and intrusting the manual possession to him without the intention necessary to constitute a delivery.'' See Williston on Contracts, vol. 1, Sec. 212. This same distinction is discussed in 2 Tiffany on Real Property (2d Ed.) p. 1772 et seq., with this conclusion on the part of the author:

''There is, it is submitted, absolutely no distinction between an instrument conditionally delivered as an escrow and one conditionally delivered as a deed, and neither can take effect until the condition is satisfied.''

The whole problem is thus discussed in 4 Wigmore on Evidence, sec. 2408:

"A legal act does not come into existence as such until its utterance is final and complete. . . . All transactions require an appreciable lapse of time for their fulfillment; most important transactions in writing are consummated only after successive inchoate acts of preparation, drafting, and revision. Moreover, the written terms may be prepared with a precision which leaves nothing to alter (as it turns out), and still may be for a while retained for reflection or submitted for suggestion, without as yet any final adoption. Until some finality of utterance takes place, there is no legal act. Whenever, therefore, certain conduct or writing is put forward against a party as his purporting act, no principle prevents him from showing that there never was a consummation of the act.

"(1) But where shall the line be drawn? The earlier laws . . . draw the line formally for deeds—i. e., sealed instruments—at the stage technically known as 'delivery.' The mark of finality was the *delivery of the deed*. But it is clear that there can be no fixed and invariable mark of finality; or, in the older phraseology, what amounts to a delivery depends upon the circumstances of the case. No specific manual act is decisive. On the one hand, it is well accepted that the *handing* of the deed to a *third person* is not necessarily final; the document may still be withdrawn, or less correctly 'revoked.' On the other hand, the *maker's retention* of the document does not necessarily negative the act's finality; this, too, may be deemed unquestionable law since Mr. Justice Blackburn's masterly exposition. Again, that specific variety of delivery to a *third person* which consists in naming a condition precedent to be performed, and making the act final except for the happening of the condition—the usual meaning of '*escrow*',—has long been recognized as leaving the act incomplete; though here it may well be that the document cannot be withdrawn, since nothing but the condition remains to complete the act. A conditional delivery *in escrow to the grantee*, however, has come down to us traditionally as a complete act, the condition being deemed vain. But this is an arbitrary distinction; no reason and no policy justifies it. In England, the older rule, as handed down in Coke's treatises,

has for more than two generations been repudiated. In the United States, it has been generally trenched upon so far as to recognize an escrow to a co-obligor as incomplete. In other respects, it is maintained by the authority of the older decisions in most jurisdictions. But it is being gradually cut away, sometimes by subtly recasting the definition of a delivery; and the solid establishment of the contrary rule . . . for contracts and writings in general (i. e. other than sealed instruments—bonds and land-deeds) will ultimately efface this last tradition of formalism.

"There is, therefore, no invariable mark of finality for a deed.—whether it be the act of writing, or of sealing, or of manually delivering, or of publicly recording. Subject to certain usual presumptions of conduct, the circumstances of each case must control."

But we need not discuss the question further, since the later decisions of this court, which we have cited above, are uniformly to the effect that, if there be no intention of presently passing the title, and if the intention is that title is not to pass until something else be done or takes place, the manual transfer of possession of a deed to the grantee will not constitute such a delivery as to vest title in the grantee. Consistent with this rule, it has been held in our sister jurisdictions that there is no such legal delivery of a deed so as to pass title to the grantee, where, although the deed is placed in the possession of the grantee, the understanding between the grantor and grantee is that the title is to pass from the grantor to the grantee, only upon the contingency of the death of the grantor before that of the grantee. Elliott v. Merchants' Bank & T. Co., 21 Cal. App. 536, 132 P. 280; Elliott v. Murray, 225 Ill. 107, 80 N. E. 77; Kenney v. Parks, 137 Cal. 527, 70 P. 556; Phelps v. Pratt, 225 Ill. 85, 80 N. E. 69; 9 L. R. A. (N. S.) 945; Taylor v. Taylor, 79 Colo. 487, 247 P. 174; Coles v. Belford, 289 Mo. 97, 232 S. W. 728, 729; Wilson v. Wilson, 158 Ill. 567, 41 N. E. 1007, 49 Am. St. Rep. 176. The case of City National Bank of Cairo, Ill. v. Anderson, supra, relied upon by the plaintiffs, is not in conflict with these views, as there the intention of the parties was plainly that the title should pass with the transfer of the possession of the deed subject to a defeasance in case of nonpayment

of the purchase price. In other words, it was a "delivery," with a condition subsequent attached.

It is urged, however, that a sound policy dictates and supports the rule that there can be no delivery in escrow to a grantee, because otherwise the door would be opened for the perpetration of fraud and at a time when, for example, if the grantee were dead, as here, it would, as is argued, be next to impossible to defeat such fraud. As hereinbefore pointed out, if the word "delivery" in the statement of this proposition means something more than the mere intrusting of the manual possession of the instrument to the grantee without any intention of presently passing the title, we have presented a different state of case than that disclosed by this record. The manual possession of deeds is daily intrusted to grantees for the purpose of having them examined by the grantee's attorneys and ofttimes for other purposes, but no one contends that such intrusting of the manual possession is such a delivery as to pass title to the property. The reason, of course, is that there is no intention of presently passing the title. In such a state of case, the condition on which the manual possession of the deed was intrusted to the grantee is always open to proof. Where is the opportunity for fraud any greater or less in that kind of a case than in the kind of case where the manual possession of a deed is intrusted to the named grantee, but with no intention of ever passing the title unless within a period which is bound at some time to come to an end, a condition is fulfilled or not? Only in the element of time. We do not have presented a case of intervening claims of innocent third parties who, say, have purchased for value without notice. The usual principles of estoppel will amply protect them. And undoubtedly the manual possession of a deed by the named grantee raises very strong presumptions in his favor of a complete delivery of a deed, throwing the burden on the other party to establish by clear and convincing evidence that the intention of the parties when the manual possession of the deed was intrusted to the grantee was not to presently pass title. All this, coupled with the rights of parties to testify concerning transactions or conversations had with deceased parties, throws as many safeguards about such a transaction as the parties to it can rightfully or fairly ask.

We are therefore of the opinion that, under the facts of the instant case, the deed of September, 1925, never divested Mrs. Hood of the title to the boulevard property.

From what we have said, it results that, in the case of Hood v. Nichol, the judgment on the original appeal, in so far as it adjudges that Mrs. Hood held the boulevard property in trust for the beneficiaries designated by the will of Jane Higgins under an express trust, is erroneous. It is therefore reversed, with instructions to enter a judgment adjudging Mrs. Hood to be the legal and beneficial owner of such property subject to any rights the said beneficiaries may have to require that property to be subjected to the satisfaction of any judgment they may obtain against the estate of William Higgins for any conversion or wasting by him of his wife's estate, and that this action, in so far as it involves such accounting, be redocketed. Whether or not William Higgins converted or wasted all or any part of his wife's estate and, if he did, to what extent, if at all, his estate or the property here in controversy is liable to said beneficiaries for such conversion or wasting, is expressly not decided herein. In all other respects, that judgment is affirmed on both the original and cross-appeals.

We have left the appeal in the case of Hood v. Martin, wherein the chancellor set aside the judgment of adoption of Mrs. Hood by William Higgins. That the plaintiffs in this suit had the right to attack those proceedings on the grounds of mental incapacity on the part of William Higgins and undue influence practiced upon him by Mrs. Hood is settled by the case of Greene v. Fitzpatrick, 220 Ky. 590, 295 S. W. 896. The chancellor rested his judgment upon the ground of undue influence. We have carefully read the evidence produced upon this issue, and, without setting it out at length, we are of the opinion that it supported the chancellor in his conclusions. Hence it will be unnecessary to discuss or decide whether the lack of mental capacity was also established or not. Hence, on this appeal, the judgment is affirmed.

Whole court sitting.